**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

|  |  |
|---|---|
| AMY HAWKINS and RANDALL BRINK behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> HEALTH GORILLA, INC.; RAVILLAMED PLLC; UNIQUE MEDI TECH LLC D/B/A MAMMOTH DX; MAMMOTH PATH SOLUTION, LLC; MAMMOTH RX, INC.; UNIT 387 LLC; SELFRX, LLC D/B/A MYSELF.HEALTH; AND CRITICAL CARE NURSE CONSULTANTS, LLC D/B/A GUARDDOG TELEHEALTH, <br><br> Defendants. | Case No. _____ <br><br> **CLASS ACTION** <br><br> **DEMAND FOR JURY TRIAL** |

**CLASS ACTION COMPLAINT**

Plaintiffs Amy Hawkins and Randall Brink ("Plaintiffs"), on behalf of themselves and all others similarly situated, bring this Class Action Complaint (the "Action") against the above-captioned Defendants, Health Gorilla, Inc. ("Health Gorilla"), RavillaMed PLLC ("RavillaMed"), Unique Medi Tech LLC d/b/a Mammoth Dx ("Mammoth Dx"), Mammoth Rx, Inc. ("Mammoth Rx"), Mammoth Path Solution, LLC (together with Mammoth Dx and Mammoth Rx, "Mammoth"), Unit 387 LLC ("Unit 387"), SelfRX, LLC d/b/a Myself.Health ("SelfRx"), and Critical Care Nurse Consultants, LLC d/b/a GuardDog Telehealth ("GuardDog" and collectively with RavillaMed, Mammoth, Unit 387, and SelfRx, the "Bad Actors", and together with Health

Gorilla the "Defendants"), and alleges upon personal knowledge as to themselves and their own actions, and upon information and belief as to all other matters, as follows:

## I. NATURE OF THE ACTION

1. Plaintiffs bring this Class Action Complaint against Health Gorilla and the Bad Actors for their exploitation of health exchange frameworks to fraudulently access and steal the sensitive personally identifiable information ("PII") and protected health information ("PHI" and together with PII, the "Private Information") of Plaintiffs and Class members.

2. Health Gorilla does business as an "Implementer," in the Carequality framework, and a Qualified Health Information Network ("QHIN") in the Trusted Exchange Framework and Common Agreement ("TEFCA"). The Carequality framework and TEFCA (the "Interoperability Frameworks") are two national frameworks responsible for more than a billion patient-record exchanges between healthcare industry participants every month. TEFCA is a federally sponsored Interoperability Framework for healthcare providers to exchange patient records to facilitate coordination and continuity of care for patients nationwide, the Carequality framework is a similar private network. Both the TEFCA and Carequality framework are administered and maintained by the non-profit organization The Sequoia Project.

3. Certain of Health Gorilla's customers, the Bad Actors, abused these networks for illicit commercial gain on Health Gorilla's watch. Through thinly veiled disguises, they pose as healthcare providers and falsely certify that they are accessing electronic patient records over these networks for treatment purposes. Once they retrieve patient records through the Interoperability Frameworks, they use or sell the records for profit and commercial exploitation.

4. As an Implementer/QHIN providing access for these Bad Actors, Health Gorilla was contractually, ethically, and legally responsible for vetting their qualifications to access the

Interoperability Frameworks prior to granting them access, including conducting adequate and robust due diligence prior to approving their applications, and monitoring and verifying that their activity over the network was consistent with legitimate uses.  Health Gorilla failed on all counts.

5.    Health Gorilla's and the Bad Actors' failures to safeguard and protect Private Information of Plaintiffs and Class members and to maintain the integrity of the vast Interoperability Frameworks on which principles of continuity of care rely constitute moral, ethical, and legal violations of the highest order.

6.    The Bad Actors were not vetted, and their activities were consistent with abuse. Despite certain red flags and affirmative notice of misconduct, discussed herein, Health Gorilla failed to take reasonable and necessary actions to put a stop to and/or blatantly ignored their conduct, as it was required to do.

7.    As a result of Health Gorilla's failures, Plaintiffs' and Class members' Private Information was accessed by these Bad Actors.

8.    On January 13, 2026, Epic Systems Corporation and certain other healthcare providers and business associates filed a lawsuit seeking injunctive relief against Health Gorilla and the Bad Actors, to put a stop to the rampant fraudulent access, use, and disclosure of confidential Private Information.  *See Epic Systems Corporation, et al., v. Health Gorilla, Inc.*, et al., 2:26-cv-00321-FMO-RAO.

9.    In or around March 2026, Mosaic Life Care and University of Pittsburgh Medical Center issued public statements acknowledging that Epic notified them that their patients' information was compromised by the Defendants.

10.    By and through Health Gorilla, these Bad Actors were granted access to Plaintiffs' and Class members' complete medical records and shared those records without authorization and

without lawful purpose (the "Data Breach.").

11.     On information and belief, the Bad Actors sold or used Plaintiffs' and Class members' patient record data and the information that could be inferred therefrom to make prohibited targeted advertising, insurance claims decisions, and other unlawful, unscrupulous, and unethical practices.

12.     As such, Plaintiffs, on behalf of themselves and all others similarly situated, bring this Action for restitution, actual damages, nominal damages, statutory damages, injunctive relief, disgorgement of profits, and all other relief that this Court deems just and proper.

## II.     JURISDICTION AND VENUE

13.      This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d).  The amount in controversy exceeds the sum or value of $5,000,000, exclusive of interests and costs; there are more than 100 putative Class members; and minimal diversity exists because one or more putative Class members are citizens of a different state than Defendant.

14.     This Court has personal jurisdiction over Health Gorilla because Health Gorilla maintains its principal place of business and operations in Florida, because Health Gorilla intentionally availed itself of this jurisdiction by regularly conducting business and providing employment in Florida, and because Health Gorilla's acts and omissions giving rise to Plaintiffs' and Class members' claims occurred in and emanated from Florida.

15.     This Court has personal jurisdiction over RavillaMed, Mammoth, Unit 387, SelfRx, and GuardDog because they intentionally availed themselves of this jurisdiction through their partnerships with Health Gorilla, and because their acts and omission through their partnerships with Health Gorilla gave rise to Plaintiffs' and Class members' claims, thus emanating from

Florida.

16.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Health Gorilla's principal place of business is located at 2555 Ponce de Leon Blvd., Suite 300 Coral Gables, Florida; because Health Gorilla operates extensively in this District; and because a substantial part of the events, acts, and omissions giving rise to Plaintiffs' claims occurred in this District.

### III.   PARTIES

17.      Plaintiff Amy Hawkins is a citizen of the state of Missouri.  Plaintiff Hawkins is a patient of Mosaic Life Care whose information was compromised in the Data Breach.

18.      Plaintiff Randall Brink is a citizen of the state of Pennsylvania.  Plaintiff Brink is a patient of University of Pittsburgh Medical Center whose information was compromised in the Data Breach.

19.      Defendant Health Gorilla, Inc. is a Delaware corporation with its principal place of business in Coral Gables, Florida.  Health Gorilla connected Defendants RavillaMed, Mammoth, and Unit 387 to the Carequality framework and RavillaMed and Mammoth to the TEFCA framework so that they could obtain patient records.  In doing so, Health Gorilla affirmatively asserted that RavillaMed, Mammoth, and Unit 387 and its customers (SelfRx and GuardDog) were healthcare providers seeking access to patient records for treatment purposes.

20.      Defendant RavillaMed is a Pennsylvania professional limited liability company with a principal place of business in Philadelphia, Pennsylvania.  RavillaMed purports to provide "Comprehensive Chronic Care Management, Tailored to You" through personalized care plans, expert support, medication management, and condition monitoring.  When joining the Carequality and TEFCA frameworks through Defendant Health Gorilla, RavillaMed asserted that it was a

healthcare provider seeking access to patient records for treatment purposes.

21.     Defendant Mammoth (Mammoth Dx, Mammoth Rx, and Mammoth Path Solution, LLC) is a Delaware limited liability company with a principal place of business in Lake Forest, California.  Mammoth Dx and Mammoth Path Solution, LLC both purport to be healthcare providers.  When joining the Carequality and TEFCA frameworks through Defendant Health Gorilla, Mammoth Dx and Mammoth Path Solution, LLC asserted that they were healthcare providers seeking access to patient records for treatment purposes.  On its public website, Mammoth Rx (which has the same place of business and logo as Mammoth Dx) describes itself as a healthcare technology and software company that builds integrated digital platforms and solutions for the healthcare ecosystem.  Mammoth Rx purports to provide connections to patient records and offers a variety of solutions in the medical field, including those that purport to organize and monetize health data.

22.     Defendant Unit 387 is a Texas limited liability company, with its principal place of business located in Dallas, Texas.  Unit 387 is what Carequality refers to as a "candidate implementer," and it onboards other connections onto the framework through an implementer, in this case Health Gorilla.  Like implementers, candidate implementers are required to validate their connections and ensure that they are accurately representing their purpose of exchange.  When joining the Carequality framework through Defendant Health Gorilla, Unit 387 asserted that it was a candidate implementer and would not be initiating requests for records.  Through its connection with Health Gorilla, Unit 387 also provides access to the Carequality framework to downstream connections like Defendants SelfRx and GuardDog, in both cases on the basis that these Defendants are purported healthcare providers seeking access to patient records for treatment purposes.

23.     Defendant GuardDog is a Texas limited liability company, with its principal place of business in Austin, Texas.  When seeking to join the Carequality framework, GuardDog asserted that it was a healthcare provider seeking access to patient records for treatment purposes. In fact, GuardDog has admitted that its business is instead focused on requesting, reviewing, and summarizing medical records, and providing those medical records to law firms.

24.     Defendant SelfRx is a Massachusetts limited liability company with its principal places of business in Boston, Massachusetts.  When seeking to join the Carequality interoperability framework, SelfRx asserted that it was a healthcare provider seeking access to patient records for treatment purposes.

## IV.     FACTUAL BACKGROUND

### A.  Carequality and TEFCA Interoperability Frameworks

#### 1.  Carequality Framework

25.     Carequality is a 501(c)(3) nonprofit organization that operates a national interoperability framework, the Carequality Framework, designed to enable the exchange of electronic healthcare information among participating entities.

26.     The Carequality framework consists of two types of entities: Implementers, which operate health data-sharing networks, and Carequality Connections ("CC"), which are members of an Implementer's network, such as healthcare providers.  By analogy, Implementers are like cellular networks (e.g., AT&T, Verizon, etc.) and CCs are like cell phone users—participation on the Carequality Framework is similar to how a cell phone user on AT&T's network is able to communicate with a cell phone user on Verizon's network.  Similarly, the Carequality Framework enables participant healthcare providers using different electronic health record software (like

Epic), to exchange clinical information for the purpose of treatment using industry-defined technical standards.

27.     Carequality maintains a central directory that includes the electronic endpoints that enable the communication among Implementers and CCs.  Once a connection is entered into Carequality's directory and distributed to all Implementers, it can query for and take any patient's patient record if it asserts a valid purpose for doing so.  Typically, a connection requires only basic demographic information (such as an individual's name, address, or date of birth) to query and receive back a patient's medical information.  When a CC requests patient records from another CC, the responder *must* respond with the patient record without reviewing the request or applying any discretion, meaning the responder cannot manually review the validity of the request.

28.     Given that ease of access, Implementers must vet their CCs, including candidate implementers, prior to entering them into the Carequality directory.

29.     The information that Implementers and CC exchange within the Carequality Framework includes sensitive, Private Information, including information protected under the Health Insurance Portability and Accountability Act ("HIPAA").  According to Carequality, over 1.2 billion medical documents are exchanged each month through the Carequality Framework.

30.     Health Gorilla is an Implementer within the Carequality Framework.

31.     To join the Carequality Framework Implementers must execute the Carequality Connected Agreement (the "CCA"), which is a contract between the Implementer and Carequality governing the terms and conditions of participation.  Health Gorilla has entered into a CCA with Carequality.

32.     Implementers, in turn, onboard CCs to the Carequality Framework through agreements called Carequality Connection Terms ("CC Terms").  These contracts between the CC

and the Implementer set forth the terms and conditions of the CC's participation on the Carequality Framework. Upon information and belief, RavillaMed, Mammoth, and Unit 387, entered into CC Terms with Health Gorilla.

### a. The Carequality Connected Agreement (CCA)

33. The CCA is the foundation for trusted exchange within the Carequality Framework and sets forth the standard terms agreed to by all Implementers.

34. Sections 7, 15.2, and 15.4 of the CCA require the Implementer to ensure that its CCs comply with the CC Terms and all applicable components of the Implementation Guides and Carequality Policies

35. Section 13 of the CCA provides that the Implementer "shall only engage in exchange activities through the Carequality Elements for permitted purposes as defined in the Implementation Guides."

### b. The Carequality Connection Terms (CC Terms)

36. The CC Terms set forth the standard terms that Implementers are required to make binding on any CC prior to allowing them to engage in exchange activities.

37. Section 5 of the CC Terms requires the CC to comply with all mandatory components of the Carequality Policies and the relevant Implementation Guides.

38. Section 12 of the CC Terms provides that the CC "shall only engage in exchange activities through the Carequality Elements for permitted purposes as defined in the Implementation Guides."

39. Section 12 further provides that if the CC is not a Covered Entity under HIPAA regulations, then "(i) [the CC] may only use the interoperability available through Carequality to transmit or receive information on behalf of its End Users and not on its own behalf; and (ii) [the

CC] will not re-use, re-disclose, aggregate, de-identify or sell any information transacted by its End Users for its own benefits unless its respective Carequality Connections or End Users have given Organizations the explicit written authority to do so."

40.     On information and belief, the Bad Actors who abused the system on Defendants' watch agreed to standard CC Terms.

### 2.   TEFCA Framework

41.     Many of the participants in the Carequality Framework also participate in TEFCA, a separate, federal framework for nationwide sharing of health information.   TEFCA was authorized by Congress in the 21st Century Cures Act and launched in 2023 with the goal of enabling the sharing of health records between providers, patients, payers, and government agencies.   Much like the Carequality Framework, TEFCA operates as a network of networks, allowing interoperability between health systems using distinct health IT vendors, creating common technology standards, data use agreements, and directories with electronic endpoints for each participant.

42.     On TEFCA, Participants are organizations within a QHIN's network, such as healthcare providers, members, customers, and vendors.   They are the equivalent of CCs within the Carequality Framework.

43.     Health Gorilla is a QHIN, and RavillaMed and Mammoth are Participants through Health Gorilla.

44.     QHINs and Participants share patient records within TEFCA, which include sensitive, Private Information that is protected under HIPAA.

45.     To join TEFCA, QHINs must execute the Common Agreement.   Upon information and belief, Health Gorilla has entered into the Common Agreement.

46.     QHINs, in turn, onboard Participants to TEFCA through agreements called Terms of Participation ("ToPs").   These contracts between the Participant and the QHIN set forth the terms and conditions of the Participant's involvement in TEFCA.  They must be accepted without modification.  Upon information and belief, RavillaMed and Mammoth entered into ToPs with Health Gorilla.

### a.   The Common Agreement

47.     The Common Agreement is created by statute, serves as the foundation for trusted exchange within TEFCA, and sets forth the standard terms agreed to by all QHINs.

48.     Section 1.2.4 requires the QHIN to contractually obligate its Participants to comply with the ToPs.

49.     Section 7.4.1 provides that the QHIN "shall be responsible for its acts and omission, and the acts or omissions of its Participants and their Subparticipants" except as prohibited by applicable law.

50.     Section 9.2 provides that a signatory must use TI (defined as "TEFCA Information," meaning information exchanged through TEFCA subject to some limitations) in any manner that "(i) is not prohibited by Applicable Law, (ii) is consistent with Signatory's Privacy and Security Notice, if applicable; and (iii) is in accordance with Sections 11[1] and 12[2] of this Common Agreement, if applicable."

### b.   Terms of Participation (ToPs)

51.     The ToPs set forth the standard terms that QHINs are required to make binding on any Participant prior to allowing them to engage in exchange activities.

---

[1] Section 11 is the Common Agreement privacy provision.
[2] Section 12 is the Common Agreement Security provision.

52.     Section 5.1 provides "[y]ou may only utilize TEFCA Exchange for an XP [exchange purpose] …. All TEFCA Exchange is governed by and must comply with the Framework Agreements [with respect to QHINs, the Common Agreement; and with respect to a Participant or Subparticipant, the ToPs] governing the QHINs, Participants, and Subparticipants engaging in the TEFCA Exchange."

53.     Section 5.2 provides "[y]ou may Use TI in any manner that: (i) is not prohibited by Applicable Law; (ii) is consistent with Your Privacy and Security Notice, if applicable; and (iii) is in accordance with Sections 7[3] and 8[4] of these ToP."

54.     Section 7.1 provides that Participants that are Non-HIPAA Entities shall comply with the HIPAA Privacy Rule with respect to Individually Identifiable Information, which is PHI.

55.     Section 9 provides that Participants "shall comply with all Applicable Law and shall implement and act in accordance with any provision required by the ToP, including all applicable SOPs and provisions of the QTF ["QHIN Technical Framework"], when engaging in or facilitating TEFCA Exchange."

56.     Section 13.1 provides that "[s]ignitor[ies] shall comply with all Applicable Law and shall implement and act in accordance with any provision required by this Common Agreement, including all applicable SOPs and provisions of the QTF, when providing Designated Network Services or otherwise engaging in or facilitating TEFCA Exchange."

57.     Section 13.2.2 provides that "[s]ignitor[ies] shall be responsible for taking reasonable steps to confirm that all of its Participants and Subparticipants are abiding by the ToP, all applicable SOPs, and any decisions made pursuant to Section 16.3."

---

[3] Section 7 is the ToP privacy provision.
[4] Section 8 is the ToP security provision.

58. Section 14.2 provides that "The SOPs are incorporated by reference into this Common Agreement, and Signatory shall comply with all SOPs that are applicable to it. In the ToP, Participants and Subparticipants will agree to comply with all applicable [Standard Operating Procedures]."

### B. Interoperability Frameworks Are Being Exploited

59. Unscrupulous businesses and individuals are exploiting Interoperability Frameworks to obtain patient records on a large scale under the false pretense of providing treatment. These entities improperly obtain access to patient records for the purpose of profiting by illegally selling them to third parties.

60. These abusers have repeatedly targeted the Carequality and TEFCA Frameworks.

61. When these groups are caught in their schemes, they do not stop their prohibited behavior but instead use increasingly sophisticated techniques to further disguise their abuse of interoperability frameworks.

62. While their initial attempts to gain access to the treatment networks were more obviously on behalf of law firms, these actors now camouflage themselves to bolster the outward appearance that they are providing medical treatment. They use medical-sounding names for their companies. Their websites have photos of clinical settings, descriptions of their purported clinical care, and some have access features for patients who seek care. But a closer inspection reveals the photos are often stock images, videos are sometimes AI-generated, the care descriptions are typically vague, and their sites, including patient access features, are either non-functional or have limited functionality.

63. Some companies also use ownership structures and different entities to separate the company that obtains the patient record from the company that sells the patient record. For

instance, on information and belief, RavillaMed obtains the data for purported "treatment" purposes and feeds that data to a company which sells records to third parties, including law firms, for litigation-related purposes.

64.     Further, these companies are manipulating their exchange metrics to appear like an entity providing treatment.  Under normal conditions, treatment-based exchange of patient records occurs in an even pattern and the volume of patient record exchange between providers is reciprocal because when a record is sent for the purpose of treatment, the results of that treatment are shared back to the original provider organization.  Large spikes in the number of records retrieved or non-reciprocal exchange are not typical and are grounds for an Implementer to investigate what might be occurring and are one potential indicator that records may not have been obtained for a treatment purpose.  In April 2024, Epic published a widely distributed risk notification document in which Epic explained that among the indicia of non-treatment-based exchange are sudden spikes in exchange and only one-way record retrieval with no records being returned.  Nefarious entities, like Health Gorilla and the Bad Actors, learned from this and evolved their tactics to hide their true purpose by eliminating spikes and returning a more even amount of records.  However, upon inspection, the returned records—which can be injected into patient charts and reviewed by future care providers—often contain junk data with little to no clinical information.  Junk transactions like those of the Bad Actors thus increase server costs, jam the traffic of real records being exchanged, and waste valuable clinician time for health care providers. Worse, junk records can cloud the true patient medical history and negatively impact patient care. And the Bad Actors' junk records further confirm that no treatment was actually provided, contrary to representations otherwise.  The exploitation of access to patient records through the Carequality and TEFCA frameworks is a problem that has become increasingly complex and alarming.

65.     Health Gorilla failed to take adequate steps to vet candidates for its network. Notably, according to the Epic complaint (¶¶ 132–137), Health Gorilla onboarded certain entities even after they were rejected by others because investigations revealed that their activities were not for treatment purposes, as stated.  Health Gorilla did not identify the same suspicious behavior, or did not care, and Health Gorilla onboarded them and allowed them to engage in their fraudulent schemes undisturbed.

66.     For example, one entity it onboarded was named Integritort.  The use of the word "tort" in the name should have set off alarms that it was a marketer to mass tort and class action law firms.

67.     Another entity called Constant Care Health ("CCH") queried the network for more than 59,000 records while sharing only 80 back before Health Gorilla was forced to end CCH's access.  Heavily skewed one-way traffic, or "nonreciprocal" sharing, is highly suspicious. Typical healthcare providers share and query at a 1:1 ratio, and not volumes that are out of proportion to their size.

68.     The Bad Actors, through Health Gorilla, abused the Interoperability Frameworks by accessing sensitive Private Information under false assertions of treatment purposes and providing the Private Information to third parties who have no right to them.

69.     Defendant Health Gorilla, as a Carequality Implementer, added Defendants RavillaMed, Mammoth, SelfRx, and Unit 387 as CCs.  Health Gorilla is also a TEFCA QHIN that onboarded Defendants RavillaMed and Mammoth as Participants.   When joining both Interoperability Frameworks, RavillaMed and Mammoth represented that they sought access to patient records for treatment purposes.  Based on a statement from Health Gorilla, Defendants Unit 387 and SelfRx evidently made similar representations when they joined the Carequality

Framework. GuardDog also represented that its connection to the Carequality Framework (by way of Unit 387 and Health Gorilla) was proper based on GuardDog's treatment purposes.

70. Despite their representations of treatment purposes and their obligations under their Carequality and TEFCA agreements, the Bad Actors have fraudulently accessed sensitive Private Information for non-treatment purposes in violation of federal and state law. Health Gorilla has knowingly enabled them to do so.

### i. RavillaMed

71. Health Gorilla onboarded RavillaMed after it was already kicked off of the Carequality framework by another Implementer. RavillaMed engaged in unusual activity over the network, requesting tens of thousands of complete patient records per month in a non-reciprocal manner. In fact, since gaining access to the Interoperability Frameworks, RavillaMed has taken over 42,000 patient records through Carequality and TEFCA from Epic's healthcare provider customers alone (in addition to an unknown number of patient records that were taken from organizations other than Epic).

72. The RavillaMed domain (ravillamed.com) website offers minimal substantive information explaining how its services are actually delivered, and most pages make broad, generalized healthcare statements. The pictures are almost exclusively stock photography images with one identical image appearing across three different pages. The website largely omits contact information such as address and phone number, and the "Contact us" feature has a significant functionality failure – after filling out the required fields, no visible submit button is present. All of this presents a serious red flag about the existence of RavillaMed's actual treatment of patients.

73. RavillaMed's pattern of accessing patient records also reveals large spikes. For instance, in August 2025, it took more than 17,000 patient records from the Epic community alone,

and in October 2025, it took almost 10,000 more, which is highly unusual for the small medical practice that RavillaMed purports to be.

74.     Further, RavillaMed sent back to providers far fewer patient records than it took. This non-reciprocal exchange pattern between RavillaMed and healthcare providers is atypical for healthcare providers and presents another red flag that RavillaMed did not actually provide treatment.

75.     Further, review of patient records that RavillaMed returned to Epic's healthcare provider customers revealed records reflecting no evidence of treatment by any RavillaMed clinician.  There were no diagnoses, prescriptions, or treatment plans from RavillaMed clinicians. Instead, the patient records primarily consisted of previous diagnoses made by providers other than RavillaMed and were organized to highlight forever chemical PFAS-associated diagnosis, a subject matter that is highly litigated in mass tort and class action lawsuits.

76.     RavillaMed is closely affiliated with LlamaLab, Inc.  LlamaLab is in the business of selling patient records to trial attorneys and not providing treatments to patients.  LlamaLab's website (www.llamalab.ai) explains that the company offers "Same-Day Medical Records Retrieval for Law Firms" and related services.

77.     On or around November 7, 2025, Epic shared evidence of RavillaMed's misconduct with the Care Everywhere Governing Council[5].  That same day, Epic and the Care Everywhere Governing Council escalated the matter to Carequality and Health Gorilla requesting an investigation and that RavillaMed be stopped from taking records.  Health Gorilla initially

---

[5] The Care Everywhere Governing Council is a collection of volunteer Epic customer representatives elected by their peers which, among other responsibilities, performs additional diligence when Implementers add new CCs prior to distributing the CCs connection to Epic's customers.

represented to Epic and Carequality that Health Gorilla had imposed a "voluntary" suspension concerning RavillaMed in November 2025 while it investigated the issue, but RavillaMed was nonetheless able to take records from the Interoperability Frameworks into December 2025.

### ii. Mammoth

78. Defendant Mammoth engaged in a deliberate scheme to unlawfully obtain and misuse confidential patient records, including records of Plaintiffs and Class members.

79. Mammoth Dx represents on its website (https://mammoth-dx.com/) that it is an advanced diagnostic laboratory offering molecular and pathology testing with a focus on Epidermal Nerve Fiber Density testing. Mammoth represents that its on-staff pathologists review historical patient records "to provide more precise results and treatment plans."

80. In or around July 2024, Health Gorilla entered Mammoth into the Carequality and TEFCA directories. Consistent with the requirements of the frameworks, Mammoth would have represented to Health Gorilla that Mammoth sought access because it needed patient records for treatment purposes, and Health Gorilla would have affirmed that representation to the frameworks and all of the participants on the frameworks. Since gaining access to the interoperability frameworks, Mammoth – using Health Gorilla – has taken over 140,000 patient records through Carequality and TEFCA from Epic's healthcare provider customers (in addition to an unknown number of patient records that were taken from other organizations nationwide).

81. Mammoth exhibits highly abnormal patient-record exchange patterns. Rather than the steady, reciprocal flow of patient records associated with patient care, Mammoth has taken large quantities of patient records in spikes, which is indicative that the patient records were accessed for non-treatment purposes.

82.    A number of Epic's healthcare provider customers reviewed patient records returned to them by Mammoth.  Records received from Mammoth lack basic clinical information that one would expect from a medical laboratory, which Mammoth purports to be, such as test results and dates of those tests.  Instead, they included vague clinical notes that also lack basic information such as a date, clinical assessment, plan, or clinical recommendations.  It is unclear what services, if any, Mammoth purports to have provided.  The records are blank or otherwise clinically useless, in other words junk data, which is a key indication that no treatment was provided.

83.    From July 2024 to October 2025, Mammoth obtained sensitive patient records from Plaintiffs and Class members through Carequality and TEFCA, falsely asserting that the requests were for treatment purposes and without requisite authorization.  On information and belief, Mammoth has disclosed some or all of Plaintiffs' and Class members' patient records to Nationwide Healthcare Provider Corp, an entity which markets patient records to attorneys, and/or other entities for sale for profit.

84.    Further, Daniel Baker[6], the former CEO of Integritort was the founder and Chief Technology Officer of Mammoth Rx.  In or around October 2024, Integritort was banned from the Carequality network after Epic filed a formal Carequality Dispute presenting evidence that Integritort was pitching its services to law firms on the basis that Integritort could retrieve medical histories for potential plaintiffs for mass tort lawsuits.  Integritort was obtaining these records by falsely claiming the treatment purpose through Carequality.

---

[6] Daniel Baker has also previously been criminally prosecuted and banned from the U.S. securities industry for fraud in 2014.

85.     In or around October 24, 2024, Epic informed Health Gorilla of Mammoth's ties to Baker.  Health Gorilla denied any relationship between Mammoth and Integritort.  Health Gorilla reported it was "satisfied" based on findings of its "extensive investigation" that Epic's concerns were unfounded.

### iii.     Unit 387

86.     Unit 387, acting with GuardDog and SelfRx, engaged in a deliberate scheme to unlawfully obtain and misuse confidential patient records.

87.     In September 2022, Health Gorilla entered Unit 387 into the Carequality directory as a candidate implementer.  Consistent with the requirements of the Carequality framework, Unit 387 would have represented to Health Gorilla that Unit 387 sought access because its customers needed patient records for treatment purposes, and Health Gorilla would have affirmed that representation to the Carequality framework and all of the participants on the framework.  Since gaining access to the Carequality framework, Unit 387's customers (including SelfRx and GuardDog) have taken over 100,000 records through Carequality from Epic's healthcare provider customers community members alone.

88.     Unit 387's founder and CEO, Meredith Manak, is also the founder and CEO of Hoppr, LLC, an entity that "instantly aggregates all patient records" for law firms and "provides near instant access to patient records for insurance companies."

89.     Unit 387 is not only a CC but also a candidate implementer, meaning it can onboard downstream connections to the Interoperability Frameworks under Health Gorilla and has its own connections to the frameworks, including Defendants SelfRx and GuardDog.

90.     Defendant SelfRx is one of Unit 387's downstream connections.  SelfRx has had access to the Carequality directory since September 2022.  Consistent with the requirements of the

framework, SelfRx and Unit 387 would have represented to Health Gorilla that SelfRx sought access because SelfRx needed patient records for treatment purposes, and Health Gorilla would have affirmed that representation to the framework and all of the participants on the framework. Since gaining access to the Carequality framework, SelfRx has taken over 100,000 patient records through Carequality from Epic's healthcare provider customers (in addition to an unknown number of patient records that were taken from other organizations nationwide), all using Health Gorilla and Unit 387.

91.     Since August 2024, SelfRx has exhibited highly abnormal patient-record exchange patterns. From October 2023 to July 2024, SelfRx requested single-digit patient records per month from Epic's healthcare provider customers. Suddenly, in August 2024, it began requesting rapidly increasing numbers of patient records in sporadic spikes. In December 2024, it took nearly 17,000 patient records from Epic's healthcare provider customers, and over 14,000 in March 2025. These spikes raise significant red flags that suggest that the patient records were not actually for treatment purposes.

92.     Defendant GuardDog is one of Unit 387's downstream connections. GuardDog has had access to the Carequality directory since September 2024. Consistent with the requirements of the framework, GuardDog and Unit 387 would have represented to Health Gorilla that GuardDog sought access because GuardDog needed patient records for treatment purposes, and Health Gorilla would have affirmed that representation to the framework and all of the participants on the framework. Since gaining access to the Carequality frameworks, GuardDog has taken over 6,000 patient records through Carequality from Epic's healthcare provider customers (in addition to an unknown number of patient records that were taken from organizations nationwide).

93. On March 13, 2026, GuardDog, named as one of Health Gorilla's co-defendants, entered into a Stipulation for Judgment in the *Epic* lawsuit. GuardDog admitted that: "

> for the duration of its existence [since 2024], its business [] focused on requesting, reviewing, and summarizing medical records, and providing those medical records to law firms . . . GuardDog further admits that, in 2024, GuardDog obtained direct access to the Carequality Framework through a contractual relationship with Health Gorilla after GuardDog informed Health Gorilla that Unit 387 was impermissibly holding itself out as [Critical Care Nurse Consulting LLC ("CCNC"), GuardDog's predecessor] and requesting medical records from the Carequality Framework under the false assertion that those medical records were being requested by CCNC, when the medical records were in fact being requested directly by Unit 387 . . . GuardDog admits that, at the time GuardDog was connected to the Carequality Framework, GuardDog understood and believed that Health Gorilla was aware of GuardDog's business activities in requesting, reviewing, and summarizing medical records, and providing those medical records to law firms.

94. On November 11, 2025, Epic and the Care Everywhere Governing Council escalated concerns about Unit 387 and its CC's misconduct in a letter to Health Gorilla. Upon information and belief, Health Gorilla has not responded and the issues remain unresolved.

95. Health Gorilla failed to put a stop to the Bad Actors, even after it had more than enough knowledge of their abuse of the network. Health Gorilla not only failed to stop it but, when others confronted Health Gorilla with evidence of abuse, Health Gorilla ignored the obvious and refused to take action to terminate the Bad Actors' access to the network.

### C. The Data Breach Was Foreseeable

96. It is common knowledge that businesses that store Private Information are likely to be targeted by fraudsters and criminals; to hold the systems for ransom and to sell the personal data on the black market so the buyers can commit identity theft and make other illicit profits off the data.

97. The intimate, comprehensive, and confidential financial and health data at issue here is some of the most valuable to identity thieves, advertisers, lenders, creditors, insurers, and

other businesses.

98.     Health Gorilla knew or should have known that it was an ideal target for abuse and that the Bad Actors with nefarious purposes would attempt to access the Interoperability Frameworks for illegitimate reasons by posing as treatment providers, when they were not, and falsely requesting records for treatment purposes.

99.     Indeed, the FBI has publicly warned the healthcare industry to bolster its data security against the increasing frequency and sophistication of attacks.[7]

100.     The healthcare sector reported the second largest number of breaches among all measured sectors in 2018, with the highest rate of exposure per breach.[8]

101.     Furthermore, the healthcare sector was the easiest "mark" among all major sectors in 2021, meaning it had the highest number of data compromises and categorically had some of the most widespread exposure per data breach.[9]  According to the 2021 Healthcare Information and Management Systems Society Cybersecurity Survey, 67% of participating hospitals reported having a significant security incident within the last twelve months.[10]

102.     The Defendants knew the importance of guarding Plaintiffs' and Class members' Private Information entrusted to them and of the foreseeable consequences if that data was disclosed to the Bad Actors and the Bad Actors misused the Private Information.  Health Gorilla

[7] Jim Finkle, *FBI warns healthcare firms that they are targeted by hackers*, REUTERS (Aug. 2014), https://www.reuters.com/article/us-cybersecurity-healthcare-fbi/fbiwarnshealthcare-firms-they-are-targeted-by-hackers-idUSKBN0GK24U20140820.

[8] Identity Theft Resource Center, *2018 End-of-Year Data Breach Report*, https://www.idtheftcenter.org/wp-content/uploads/2019/02/ITRC_2018-End-of-Year-Aftermath_FINAL_V2_combinedWEB.pdf.

[9] *2021 Annual Data Breach Year-End Review*, ITRC, (Jan. 2022), https://www.idtheftcenter.org/publication/2021-annual-data-breach-report-2//.

[10] 2021 HIMSS Cybersecurity Survey, Healthcare Information and Management Systems Society, Inc., accessible at: https://www.himss.org/resources/himss-healthcare-cybersecurity-survey.

failed to implement and maintain adequate due diligence, vetting, and monitoring practices and procedures to prevent the Data Breach from occurring.

103.    Health Gorilla was notified by Epic in September 2022 that certain entities were improperly accessing patient records through its network and therefore had knowledge at least as early as then that the Bad Actors were manipulating the network to get Private Information for prohibited purposes in violation of the Carequality and TEFCA rules and the law.

104.    Health Gorilla has the resources and responsibility to invest in the necessary data security and protection measures commensurate with the stakes and its role.  Yet Health Gorilla failed to undertake adequate analyses and vetting procedures to avoid the failures that resulted in the Data Breach.

105.    Moreover, the Bad Actors failed to adhere to the Carequality and TEFCA rules and the law.

### D.  Data Breaches are Harmful and Disruptive

106.    The United States Government Accountability Office ("GAO") released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."

107.    That is because all victims of a data breach may be exposed to serious ramifications regardless of the nature of the data.  Indeed, the reason criminals steal Private Information is to monetize it because there is (unfortunately) a market for PII and PHI, like the Private Information compromised in the Data Breach.

108.    Cybercriminals do this by selling the spoils of their cyberattacks on the black market to identity thieves who desire to extort and harass victims, and to take over victims' identities in order to engage in illegal financial transactions under the victims' names.  Because a

person's identity is akin to a puzzle, the greater number of accurate individual pieces of data an identity thief obtains regarding a person, the easier it is for that thief to take on the victim's identity, or otherwise to harass or track the victim.

109.     For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information regarding a victim's identity, such as a person's login credentials or Social Security number.   Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls, deceptive text messages, and phishing emails.

110.     Because of the threat of these harms, the FTC recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (and potentially obtaining an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.

111.     Theft of Private Information is gravely serious.  Private Information is an extremely valuable property right.

112.     Its value is axiomatic, considering the value of "big data" in corporate America and the fact that the consequences of cyber thefts include heavy prison sentences.  Even this obvious risk-to-reward analysis illustrates that Private Information has considerable market value.

113.     According to the GAO:

[L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft.  Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years.  As a result, studies that attempt to measure the harm resulting

from data breaches cannot necessarily rule out all future harm.

*See* GAO Report, at p. 29.

114.    Private information, such as the Private Information compromised herein, is such a valuable commodity to identity thieves and other appropriators of information that once the information has been compromised, criminals and other appropriators of information often trade the information on the "cyber black-market" for years.  The private information of individuals remains of high value to criminals and appropriators, as evidenced by the prices paid through the dark web.  Numerous sources cite dark web pricing for stolen identity credentials.  For example, certain sets of private information can be sold at a price from $40 to $200, and bank details have a price range of $50 to $200.  Experian reports that a stolen credit card or debit card number can sell for between $5 and $110 on the dark web.  Clearly, all this data has real value – which is why it is often targeted and stolen in the first place.

115.    Because the Private Information compromised in the Data Breach has been dumped onto the dark web, Plaintiffs and Class members are at a substantial imminent risk of injury, including an increased risk of fraud and identity theft for many years into the future.

**116.**    Thus, Plaintiffs and Class members must vigilantly monitor their financial accounts and other indices of identity theft (*i.e.*, the mail, email, etc.) for many years to come.

### E. Defendants' Conduct Violates HIPAA and Industry Standard Data Security Practices

117.     Health Gorilla is a covered entity and the Bad Actors' purported to be health care providers under HIPAA (45 C.F.R. § 160.102) and are required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts

A and C.

118.    Defendants are subject to the rules and regulations for safeguarding electronic forms of medical information pursuant to the Health Information Technology Act ("HITECH").[11] *See* 42 U.S.C. §17921, 45 C.F.R. § 160.103.

119.    HIPAA's Privacy Rule or *Standards for Privacy of Individually Identifiable Health Information* establishes national standards for the protection of health information.

120.    HIPAA's Privacy Rule or *Security Standards for the Protection of Electronic Protected Health Information* establishes a national set of security standards for protecting health information that is kept or transferred in electronic form.

121.    HIPAA requires "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302.

122.    "Electronic protected health information" is "individually identifiable health information … that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

123.    HIPAA's Security Rule requires Defendants to do the following:

a.    Ensure the confidentiality, integrity, and availability of all electronic protected health information the healthcare provider, covered entity, or business associate creates, receives, maintains, or transmits;

b.    Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

---

[11] HIPAA and HITECH work in tandem to provide guidelines and rules for maintaining protected health information.  HITECH references and incorporates HIPAA.

c. Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

d. Ensure compliance by its workforce.

124. HIPAA also requires Defendants to "review and modify the security measures implemented … as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(e).

125. Additionally, Defendants are required under HIPAA to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

126. HIPAA and HITECH also obligated Defendants to implement policies and procedures to prevent, detect, contain, and correct security violations, and to protect against uses or disclosures of electronic protected health information that are reasonably anticipated but not permitted by the privacy rules. *See* 45 C.F.R. § 164.306(a)(1) and § 164.306(a)(3); *see also* 42 U.S.C. §17902.

127. The HIPAA Breach Notification Rule, 45 C.F.R. §§ 164.400-414, also requires Defendants to provide notice of the Data Breach to each affected individual "without unreasonable delay and *in no case later than 60 days following discovery of the breach*."[12]

128. HIPAA requires a covered entity to have and apply appropriate sanctions against members of its workforce who fail to comply with the privacy policies and procedures of the covered entity or the requirements of 45 C.F.R. Part 164, Subparts D or E. *See* 45 C.F.R. §

---

[12] Breach Notification Rule, U.S. Dep't of Health & Human Services, https://www.hhs.gov/hipaa/for-professionals/breach-notification/index.html (emphasis added) (last accessed March 23, 2026).

164.530(e).

129.    HIPAA requires a covered entity to mitigate, to the extent practicable, any harmful effect that is known to the covered entity of a use or disclosure of protected health information in violation of its policies and procedures or the requirements of 45 C.F.R. Part 164, Subpart E by the covered entity or its business associate.  *See* 45 C.F.R. § 164.530(f).

130.    HIPAA also requires the Office of Civil Rights ("OCR"), within the Department of Health and Human Services ("HHS"), to issue annual guidance documents on the provisions in the HIPAA Security Rule.  *See* 45 C.F.R. §§ 164.302-164.318.  For example, "HHS has developed guidance and tools to assist HIPAA covered entities in identifying and implementing the most cost effective and appropriate administrative, physical, and technical safeguards to protect the confidentiality, integrity, and availability of e-PHI and comply with the risk analysis requirements of the Security Rule."  US Department of Health & Human Services, Security Rule Guidance Material.[13]   The list of resources includes a link to guidelines set by the National Institute of Standards and Technology (NIST), which OCR says "represent the industry standard for good business practices with respect to standards for securing e-PHI."  US Department of Health & Human Services, Guidance on Risk Analysis.[14]

### F.  Harm to Plaintiffs and the Class

131.    Plaintiffs and Class members suffered actual injury from having their Private Information compromised as a result of the Data Breach, including, but not limited to, as follows: (a) misuse of their compromised Private Information; (b) damage to and diminution in the value

---

[13] http://www.hhs.gov/hipaa/for-professionals/security/guidance/index.html (last accessed March 23, 2026).

[14] https://www.hhs.gov/hipaa/for-professionals/security/guidance/guidance-risk-analysis/index.html (last accessed March 23, 2026).

of their Private Information, a form of property that Defendants obtained from Plaintiffs; (c) violation of their privacy, including the compromise of highly sensitive Private Information; (d) present, imminent, and impending injury arising from the increased risk of identity theft and fraud; and (e) actual and potential out-of-pocket losses including the loss of time.

## V.   CLASS ALLEGATIONS

132. Plaintiffs bring this nationwide class on behalf of themselves and on behalf of all others similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.  The "Class" that Plaintiffs seek to represent is defined as follows:

**Class Definition.**  All persons whose Private Information was disclosed in the Data Breach.

133. Excluded from the Class are Defendants and Defendants' subsidiaries, affiliates, officers, and directors, and any entity in which Defendants have a controlling interest; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

134. Plaintiffs reserve the right to modify or amend the definitions of the proposed Class before the Court determines whether certification is appropriate.

135. **Numerosity**.  The members of the Class are so numerous that joinder of all members is impracticable.  Upon information and belief, there are many millions of individuals whose Private Information was improperly accessed in the Data Breach, and each Class member is identifiable within Defendants' records.

136. **Commonality**.  There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class members.  These common questions of law and fact include, without limitation:

a. Whether Defendants violated the laws asserted herein;

b. Whether Defendants knew or should have known that their data

environment and security measures created a risk of a data breach;

c. Whether Defendants controlled and took responsibility for protecting Plaintiffs' and Class members' Private Information;

d. Whether Defendants' data security systems prior to and during the Data Breach were consistent with industry standards;

e. Whether Defendants owed a duty to Plaintiffs and Class members to implement and maintain reasonable security procedures and practices appropriate to the nature of the Private Information they collected, stored, and maintained from Plaintiffs and Class members;

f. Whether Defendants breached their duties to Plaintiffs and Class members to safeguard their Private Information;

g. Whether Defendants' failure to implement reasonable data security measures allowed the breach to occur and caused the theft of Plaintiffs' and Class members' Private Information;

h. Whether Defendants knew or should have known that their data security systems and monitoring processes were deficient;

i. Whether Plaintiffs and Class members suffered legally cognizable damages as a result of Defendants' misconduct;

j. Whether Plaintiffs and Class members are entitled to damages, civil penalties, equitable relief, and/or injunctive relief.

137.    **Typicality**.  Plaintiffs' claims are typical of those of other Class members because Plaintiffs' Private Information, like that of every other Class member, was compromised in the Data Breach.  Further, Plaintiffs, like all Class members, were injured by the uniform conduct of Defendants.  Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all other Class members, and there are no defenses that are unique to Plaintiffs.  The claims of Plaintiffs and those of other Class members arise from the same operative facts and are based on the same legal theories.

138.    **Adequacy of Representation**.  Plaintiffs will fairly and adequately represent and protect the interests of the Class in that they have no disabling or disqualifying conflicts of interest

that would be antagonistic to those of the other members of the Class. The damages and infringement of rights that Plaintiffs suffered are typical of the other Class members, and Plaintiffs seek no relief that is antagonistic or adverse to the members of the Class. Plaintiffs have retained counsel experienced in complex class action litigation, including data privacy class action litigation, and Plaintiffs intend to prosecute this action vigorously.

139. **Superiority of Class Action**. A class action is superior to other available methods for the fair and efficient adjudication of this controversy, as the pursuit of numerous individual lawsuits would not be economically feasible for individual Class members, and certification as a class action will preserve judicial resources by allowing the Class members' common issues to be adjudicated in a single forum, avoiding the need for duplicative hearings and discovery in individual actions that are based upon an identical set of facts. Without a class action, it is likely that many members of the Class will remain unaware of the claims they may possess.

140. The litigation of the claims brought herein is manageable. Defendants' uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

141. Adequate notice can be given to Class members directly using information maintained in Defendants' records.

142. **Predominance**. The issues in this action are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Defendants have engaged in a common course of conduct toward Plaintiffs and Class members. The common issues arising from Defendants' conduct affecting Class members set out above predominate over any individualized

issues.  Adjudication of these issues in a single action has important and desirable advantages of judicial economy.

143.    This proposed class action does not present any unique management difficulties.

## COUNT I

### NEGLIGENCE

144.    Plaintiffs repeat and reallege all preceding paragraphs as if fully set forth herein.

145.     Defendants had full knowledge of the sensitivity of the Plaintiffs' and Class members' Private Information, and the types of harm that Plaintiffs and Class members could and would suffer if Defendants permitted the information to be wrongfully disclosed.

146.    By participating in the TEFCA and Carequality Frameworks as an Implementer/QHIN and alleged healthcare providers, Defendants owed a duty to Plaintiffs and Class members to exercise reasonable care in obtaining, securing, protecting, and safeguarding their Private Information.  Defendants owed a duty to prevent the Private Information from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

147.    Defendants were required to prevent foreseeable harm to Plaintiffs and Class members and therefore had a duty to take adequate and reasonable steps to safeguard Plaintiffs' and Class members' Private Information from unauthorized release or theft.  This duty included: (1) designing, maintaining, and testing its data security systems, data storage architecture, and data security protocols to ensure Plaintiffs' and Class members' Private Information was adequately secured and protected; (2) implementing adequate vetting procedures and processes that would detect illegitimate access requests in a timely and adequate manner; (3) requesting and utilizing Plaintiffs' and Class members' Private Information only for authorized purposes; (4) timely acting on all warnings and alerts regarding security vulnerabilities and potential compromise; and (5)

maintaining data security measures consistent with industry standards and applicable federal and state laws and other requirements.

148.     Defendants had a common law duty to prevent foreseeable harm to Plaintiffs and Class members.  The duty existed because Plaintiffs and Class members were the foreseeable and probable victims of any inadequate security practices or wrongful conduct of Defendants in their collection, storage, transmission, and use of Private Information.  In fact, not only was it foreseeable that Plaintiffs and Class members would be harmed by the failure to protect their Private Information because of the prevalence of malicious actors' attempts to steal or gain unauthorized access to such information for nefarious purposes (including by the Bad Actors), but Defendants also knew that it was more likely than not that Plaintiffs and Class members would be harmed as a result.

149.     The injuries suffered by Plaintiffs and Class members were proximately and directly caused by Defendants' failure to follow reasonable, industry standard security measures and procedures to protect Plaintiffs' and Class members' Private Information.

150.     But for Defendants' wrongful and negligent breach of their duties owed to Plaintiffs and Class members, Private Information would not have been compromised.  And as a direct and proximate result of Health Gorilla's failure to exercise adequate and reasonable care and use commercially adequate and reasonable security measures, Plaintiffs' and Class members' Private Information was accessed by the Bad Actors who could and will use the information to commit identity or financial fraud and otherwise use the information to the detriment of Plaintiffs and Class members and their rights to privacy and confidentiality.  Plaintiffs and Class members face the imminent, certainly impending, and substantially heightened risk of identity theft, fraud, and further misuse of their Private Information.

151. There is a temporal and close causal connection between Health Gorilla's failure to implement security measures to protect Private Information coupled with the Bad Actors conduct and the harm that Plaintiffs and Class members suffered and will continue to suffer.

152. As a direct and proximate result of Defendants' negligence, Plaintiffs and Class members have been injured and are entitled to damages in an amount to be proven at trial. Such injuries include one or more of the following: ongoing, imminent, certainly impending threat of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; the risk of public knowledge of their diagnosis(es) related to the exposure of the identities of their health care providers; loss of the value of their privacy and the confidentiality of the stolen Private Information; illegal sale of the compromised Private Information on illicit markets; mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; time spent in response to the Data Breach reviewing transaction records, bills, claims information, financial and credit information, among other related activities; nominal and general damages; and other economic and non-economic harm.

## COUNT II

### Breach of Implied Contract

153. Plaintiffs repeat and reallege all preceding paragraphs as if fully set forth herein.

154. Health Gorilla provides for the exchange of Plaintiffs' and Class members' Private Information through the TEFCA and Carequality Frameworks, and the Bad Actors operate fraudulently as healthcare providers on the TEFCA and Carequality Frameworks. Defendants formed an implied contract with Plaintiffs and Class members through its conduct.

155. Through Defendants' individual provision of services, namely, network

transmission of patient records, they knew or should have known that they must protect Plaintiffs' and Class members' confidential Private Information in accordance with Defendants' stated policies, TEFCA and Carequality agreements, industry best practices, and the applicable law.

156.   As consideration, Plaintiffs and Class members turned over valuable Private Information as part of their transactions for Defendants' services.

157.   Defendants accepted possession of Plaintiffs' and Class members' Private Information for the purpose of providing services to Plaintiffs and Class members.  In delivering their Private Information to Defendants, Plaintiffs and Class members intended and understood that Defendants would adequately safeguard the Private Information as part of the provision or receipt of those services.

158.   Defendants' implied promises to Plaintiffs and Class members include, but are not limited to the following: (1) taking steps to ensure that anyone who is granted access to Private Information also protects the confidentiality of that data; (2) taking steps to ensure that Private Information placed in control of employees and related entities is restricted and limited only to achieve authorized business purposes; (3) restricting Private Information access only to employees and/or entities who are qualified and trained; (4) designing and implementing appropriate retention policies to protect Private Information; (5) applying or requiring proper encryption and/or the separation of different data sets containing Private Information; (6) implementing multifactor authentication for access to Private Information; (7) maintaining adequate vetting procedures and processes that would detect illegitimate access requests to the TEFCA and Carequality Frameworks; and (8) taking other steps to protect against foreseeable breaches.

159.   Plaintiffs and Class members would not have entrusted their Private Information to Defendants in the absence of such an implied contract.

160.     Defendants violated these implied contracts and these implied promises by failing to employ reasonable and adequate security measures to secure Plaintiffs' and Class members' Private Information.

161.     Plaintiffs and Class members have been damaged by Defendants' conduct, including the harms and injuries arising from the Data Breach now and in the future, as alleged herein.  Plaintiffs seek damages, including restitution, actual damages, nominal damages, and any other awardable form of damages, in an amount to be proven at trial.

## COUNT III

### Unjust Enrichment

162.     Plaintiffs repeat and reallege all preceding paragraphs as if fully set forth herein.

163.     Plaintiffs and Class members do not have an adequate remedy at law against Defendants, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

164.     Plaintiffs and Class members conferred a benefit on Defendants.  Specifically, they provided patient record information and agreed to allow network access of their records to allow treatment providers to share their records to participants in the network for permissible purposes, which Defendants shared with unauthorized persons for monetary gain.  The benefits of electronic records result in reduced transaction administration, and treatment costs.  The alternative was for Plaintiffs and Class members to insist that their patient records be kept off the network, which would defeat the network effects that the TEFCA and Carequality network are designed to foster.  Defendants abused its access to networks, and the trust of network participants, to unlawfully profit from the system and its contributors.  If trust is lost, then the whole system breaks down.

165.     Defendants accepted and retained these benefits.

166. Defendants disclosed Plaintiffs' and Class members' Private Information through inequitable actions and omissions. Under the circumstances, it would be unjust for Defendants to retain the benefits that they received from this wrongful and inequitable conduct. Plaintiffs and Class members have a superior equitable interest on the proceeds of Defendants' wrongful conduct because the proceeds were gained by profiting from their information, and invading their privacy, and the ways in which the Bad Actors used the Private Information to cause injuries to Plaintiffs and Class members, such as by identity theft, sale of their Private Information to law firms, invading their solitude with advertisements, being denied credit applications, getting a claim denied, or being denied a job opportunity because their Private Information may ultimately end up in the hands of identity thieves, advertisers, lenders, insurance companies, and employers.

167. Plaintiffs and Class members are entitled to full refunds, restitution, and/or damages from Defendants and an order disgorging all profits, benefits, and other compensation obtained by Defendants from its wrongful conduct alleged herein. This can be accomplished by establishing a constructive trust from which the Plaintiffs and Class members may seek restitution or compensation.

## COUNT IV

### Declaratory Judgment

168. Plaintiffs repeat and reallege all preceding paragraphs as if fully set forth herein.

169. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights, statuses, and legal relations of the parties and to grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of federal and state law as described in this Complaint.

170.   An actual controversy has arisen in the wake of the Data Breach regarding Plaintiffs' and Class members' Private Information and whether Health Gorilla is currently maintaining data security measures adequate to protect Plaintiffs and Class members from further data breaches that compromise their Private Information and whether the Bad Actors are currently operating on the Interoperability Frameworks to obtain Plaintiffs' and Class members' Private Information for unauthorized purposes.   Plaintiffs allege that Health Gorilla's data security measures and vetting procedures remain inadequate and the Bad Actors' access to the Interoperability Frameworks is wrongful.   Furthermore, Plaintiffs continue to suffer injury as a result of the compromise of their Private Information and remain at imminent risk that further compromises of their Private Information will occur in the future.

171.   Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

   a.   Defendants owe a legal duty to secure Private Information and to timely notify the impacted individuals of a data breach under the common law and state statutes; and

   b.   Defendants continue to breach this legal duty by failing to employ reasonable measures to secure Private Information in their possession.

172.   This Court also should issue corresponding prospective injunctive relief requiring Health Gorilla to employ adequate security and vetting protocols consistent with law and industry standards to protect Private Information under Health Gorilla's control in the Interoperability Frameworks, and to revoke the Bad Actors' access to the Interoperability Frameworks.

173.   If an injunction is not issued, Plaintiffs will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach caused by Defendants.   The risk of another such breach is real, immediate, and substantial.   If another breach caused by Defendants

occurs, Plaintiffs will not have an adequate remedy at law because many of the resulting injuries are not readily quantified, and Plaintiffs will be forced to bring multiple lawsuits to rectify the same conduct.

174.    The hardship to Plaintiffs if an injunction is not issued exceeds the hardship to Defendants if an injunction is issued.  Plaintiffs will likely be subjected to substantial identity theft and other damages.  On the other hand, the cost to Defendants of complying with an injunction by employing reasonably protective data security measures is relatively minimal, and Defendants have a pre-existing legal obligation to employ such measures.

175.    Issuance of the requested injunction is in the public interest.  Such an injunction would benefit the public by preventing another data breach caused by Defendants, thus eliminating the additional injuries that would result to Plaintiffs and Class members whose confidential information would be further compromised.

## VI.    PRAYER FOR RELIEF

176.    WHEREFORE, Plaintiffs, on their own behalf and on behalf of all others similarly situated, pray for relief as follows:

A.      For an Order certifying this case as a class action and appointing Plaintiffs and their counsel to represent the Class;

B.      For an award of actual damages, compensatory damages, statutory damages, and nominal damages, in an amount to be determined, as allowable by law;

C.      For injunctive and other equitable relief to ensure the protection of the sensitive information of Plaintiffs and the Class which remains in Defendants' possession;

D.      For an award of attorneys' fees and costs, and any other expenses, including expert witness fees;

E.      Pre- and post-judgment interest on any amounts awarded; and

F.      Such other and further relief as the Court may deem just and proper.

## VII.    JURY TRIAL DEMAND

177.    Plaintiffs hereby demand a trial by jury on all claims so triable.


DATED: April 3, 2026                        Respectfully submitted,

                                            */s/ Michael B. Homer*
                                            Michael B. Homer (FL. Bar No. 1065251)
                                            **DYNAMIS LLP**
                                            1111 Brickell Ave., 10th Floor
                                            Miami, FL 33131
                                            Tel.: 561-289-9016
                                            mhomer@dynamisllp.com

                                            Israel David (*pro hac vice forthcoming*)
                                            Adam M. Harris (*pro hac vice forthcoming*)
                                            **ISRAEL DAVID LLC**
                                            60 Broad Street, Suite 2900
                                            New York, New York 10004
                                            Telephone: (212) 350-8850
                                            israel.david@davidllc.com
                                            adam.harris@davidllc.com

                                            Mark A. Cianci (*pro hac vice forthcoming*)
                                            **ISRAEL DAVID LLC**
                                            399 Boylston Street, Floor 6, Suite 23
                                            Boston, MA  02116
                                            Telephone: (617) 295-7771
                                            mark.cianci@davidllc.com

                                            *Attorneys for Plaintiffs and the Proposed Class*